**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| B.J. STOCKLIN, | ) | CASE NO. 3:23-CV-00178-JRK |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP II |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | JENNIFER DOWDELL |
| | ) | ARMSTRONG |
| Defendant. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.   INTRODUCTION

Plaintiff B.J. Stocklin ("Mr. Stocklin") seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). (*See* ECF non-document entry dated January 31, 2023). For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.   PROCEDURAL HISTORY

On December 21 2018, Mr. Stocklin applied for DIB and SSI. (Tr. 252, 258). Mr. Stocklin's applications related to his fibromyalgia, hyperreflexia, gait disturbance, sensory disturbance, oppositional defiant disorder, generalized anxiety disorder, severe major depressive disorder, high blood pressure, and high cholesterol. (Tr. 294).

The Social Security Administration ("SSA") denied Mr. Stocklin's applications initially and upon reconsideration. (Tr. 106-07, 146-47). Mr. Stocklin requested a hearing before an

administrative law judge ("ALJ"). (Tr. 189). The ALJ held a hearing on August 5, 2020, at which Mr. Stocklin was represented by counsel. (Tr. 36). Mr. Stocklin testified, as did an impartial vocational expert ("VE"). On August 28, 2020, the ALJ issued a written decision, finding that Mr. Stocklin was not disabled. (Tr. 12). The ALJ's decision became final on January 25, 2021, when the Appeals Council declined further review. (Tr. 1).

Mr. Stocklin filed a complaint in the Northern District of Ohio challenging the Commissioner's final decision, in a case captioned *Stocklin v. Commissioner of Social Security*, Case No. 3:21-cv-00712. On October 8, 2021, pursuant to a stipulation between the parties, the Court issued an order remanding the case to the Commissioner for further administrative proceedings pursuant to Sentence Four of Section 205 of the Social Security Act, 42 U.S.C. § 405(g). (Tr. 1747).

On April 19, 2022, the Appeals Council vacated the Commissioner's final decision and remanded the case to the ALJ. (Tr. 1753). In his remand order, the Appeals Council identified the issues to be considered on remand as follows:

> The Administrative Law Judge did not properly evaluate the prior administrative findings of Todd Finnerty, Psy.D., a State agency psychological consultant (Decision, Page 12 and Exhibits 1A and 2A). Dr. Finnerty indicated that the claimant is able to work "with a small group of familiar coworkers in a less public setting where supervisory feedback is constructive" (Exhibit 1A, Page 12 and 2A, Page 12) The Administrative Law Judge found Dr. Finnerty's opinion persuasive, even acknowledged these limitations, but did not include them in the residual functional capacity finding or explain the basis for the omission (Decision, Pages 6-13). While the Administrative Law Judge may have believed that the detailed mental residual functional capacity finding sufficiently accommodated Dr. Finnerty's assessed mental limitations, the vocational expert specifically testified that the omitted limitations would constitute an accommodation, and therefore would be work preclusive (Hearing transcript, Page 38). Therefore, further consideration of Dr. Finnerty's opinions is warranted.

 (Tr. 1755).

The Appeals Council ordered the ALJ to "[g]ive further consideration to the prior

2

administrative medical findings pursuant to the provisions of 20 CFR 404.1520c and 416.920c." *Id*.

On October 5, 2020, the ALJ held a second hearing. (Tr. 1690). Mr. Stocklin testified, as did the VE. On October 28, 2022, the ALJ issued a written decision, again finding that Mr. Stocklin was not disabled. (Tr. 1659).

On January 30, 2023, Mr. Stocklin filed his complaint, challenging the Commissioner's final decision. (ECF Doc. No. 1). Mr. Stocklin asserts the following assignment of error:

(1)     The ALJ erred by failing to properly account for the opinions provided by the State Agency psychologists at both levels of consideration.

(ECF No. 6, PageID # 2332).

## III.    BACKGROUND

### A.      Personal, Educational, and Vocational Experience

Mr. Stocklin was born in 1980 and was 36 years old on the alleged onset date. (Tr. 252). Mr. Stocklin has five children. (Tr. 1699). He received his GED. (Tr. 1700). He has prior work as a landscaper, bouncer, delivery driver, electrical assistant, framer, and lineworker. (Tr. 296, 1701-04).

### B.      Relevant Hearing Testimony

#### 1.     *Mr. Stocklin's Testimony*

Mr. Stocklin testified that, out of a seven-day period, he will have approximately two days where he is not depressed or angry and lying in bed. (Tr. 1709). Mr. Stocklin also testified that he usually has a family member with him because he has bad days where he is not able to do anything physically and where he is also suffering from depression. (Tr. 1696). Mr. Stocklin testified that he is able to meet his own personal care needs and to cook simple meals. (Tr. 1697). However, he also testified that he only showers once a week because of his depression. *Id*.

Mr. Stocklin testified that he has difficulty focusing "[p]retty much all the time." (Tr.

1708). He also testified that he is rarely in a good mood and that people do not necessarily like being around him. *Id*. He further testified that he is "pretty mouthy" and is "known to say some pretty harsh things." (Tr. 1708-09). He also testified that he keeps things bottled in, and that "[w]hen I do explode, it is bad." (Tr. 1709). Mr. Stocklin further testified that he does not like crowds of people and that he tends to find a quiet spot to sit by himself. (Tr. 1707).

Mr. Stocklin testified that he is on medication, but that he does not find his medication to be helpful. (Tr. 1706). He also testified that he was undergoing counseling but that his therapist moved. *Id*. He further testified that, given his difficulties trusting people, he has not been able to find a good connection with anyone since his initial therapist moved. (Tr. 1707).

### 2. Vocational Expert's Testimony

The ALJ asked the VE to consider a hypothetical individual with Mr. Stocklin's age, education, and vocational background who could perform a full range of sedentary work but: could not climb ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel, crouch, or crawl; could frequently handle and finger bilaterally; could occasionally operate foot controls bilaterally; must avoid all exposure to vibration or vibrating tools, unprotected heights, or moving mechanical parts; could not operate a motor vehicle; would be limited to low stress work in an environment free from fast paced production with only simple work-related decision making and few if any work place changes; and could only occasionally have contact with supervisors and only incidentally and superficially have contact with coworkers and the general public. (Tr. 1711-12). The ALJ defined "incidental contact" with coworkers or the general public as "encountering or passing common areas such as break rooms, rest rooms . . . or lunch rooms," or "hallways, restrooms or lobbies," including "working at the same table with others but there would be no requirement of interaction in order to successfully complete assigned tasks." (Tr. 1712). The ALJ also defined "superficial interaction" as "being able to be in the proximity of others, able to

exchange greetings and able to engage in brief discussions that do not require persuasion or involve tandem tasks," which would "obviously . . . prevent like work group settings." *Id*. The VE testified that the hypothetical individual could perform jobs existing in significant numbers in the national economy, including work as a document preparer, tube operator, and touch-up screener. (Tr. 1712-13).

The ALJ next asked if the hypothetical individual could perform jobs existing in significant numbers in the national economy if the hypothetical individual would be absent one or more unscheduled full or partial days per week or would be unable to regularly sustain full-time work due to needing breaks that would put the individual off task at least 25% of the day. (Tr. 1713). The VE testified that those additional limitations would be work preclusive. *Id*.

In response to a question from Mr. Stocklin's counsel, the VE testified that it would be work preclusive if the individual would have problems accepting instructions from or responding appropriately to criticism from supervisors 15% or more of the time, including getting frustrated, walking away, lashing out, or talking back. (Tr. 1714).  The VE similarly testified that it would be work preclusive if the hypothetical individual would require frequent redirection or recognition to stay on task or if the hypothetical individual would require a solitary and isolated work setting. (Tr. 1714-15).

### C.  Relevant Opinion Evidence[1]

#### 1.  *Michael J. Wuebker, Ph.D.*

Dr. Wuebker completed a psychological evaluation of Mr. Stocklin on April 4, 2019 in connection with Mr. Stocklin's disability claim. (Tr. 768). Dr. Wuebker opined that Mr. Stocklin "presented with symptomology that would seemingly fir the criteria for an Other Specified

---

[1] While the ALJ determined that Mr. Stocklin suffers from multiple severe impairments, Mr. Stocklin's arguments relate only to his mental impairments. Therefore, this Report and Recommendation does not discuss medical evidence relating to any other condition.

Depressive Disorder diagnosis and a Posttraumatic Stress Disorder diagnosis." (Tr. 773). Dr. Wuebker further opined that Mr. Stocklin's prognosis regarding his mental and emotional issue "would appear to be somewhat guarded." *Id*.

Dr. Wuebker opined that Mr. Stocklin followed instructions and directions, had no problems understanding work tasks, appeared to be functioning in the average range of intelligence, and would be expected to understand and apply instructions for one step and a few more complex workplace instructions. (Tr. 774). Dr. Wuebker also opined that Mr. Stocklin maintained the flow of conversation and had attention sufficient for questions to be answered, but that Mr. Stocklin reported some problems with these abilities at work that did not prevent him from completing tasks. *Id*. Dr. Wuebker opined that "[i]t would appear that the claimant would have problems interacting appropriately in a work arena" based on Mr. Stocklin's self-reports, although Dr. Wuebker noted that "this  information was not supported in background material." *Id*. Finally, Dr. Wuebker opined that Mr. Stocklin "likely would have difficulty responding appropriately to work setting stressors" although "not all reported behaviors were in line with background material." *Id*. The ALJ found that Dr. Wuebker's opinions were "mostly persuasive." (Tr. 1678).

### 2. *State Agency Psychological Consultants*

On April 8, 2019, Todd Finnerty, Psy.D., a state agency medical consultant, opined that Mr. Stocklin had moderate limitations in his ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers; and respond appropriately to changes in the work setting. (Tr. 85-87). Dr.

Finnerty also opined that Mr. Stocklin would be able to understand and remember simple tasks; perform simple tasks in a setting that does not require fast pace; work with a small group of familiar coworkers in a less public setting where supervisory feedback is constructive; and adapt to a routine work setting where changes are given with advance notice. *Id*. On August 2, 2019, state agency psychologist Courtney Zeune, Psy.D. affirmed Dr. Finnerty's findings on reconsideration. (Tr. 123).

The ALJ found that the state agency psychological consultants' opinions were "somewhat persuasive." (Tr. 1679). The ALJ stated that the opinions were "somewhat consistent with, and supported by, the overall evidence including the claimant's sporadic mental health treatment history, mental status findings that supported no more than moderate limitations, and the claimant's report of daily activities . . . ." *Id*. However, the ALJ also stated that she "did not adopt the language of the limitation that the claimant was limited to 'work with a small group of familiar coworkers in a less public setting where supervisory feedback is constructive' since it is not a defined vocational term as to what exactly that type of interaction entails." *Id*.

### D.     Relevant Medical Evidence

On May 6, 2015, Mr. Stocklin had a diagnostic assessment session at Coleman Professional Services. (Tr. 535). Mr. Stocklin reported that his anger went from 0 to 100 in a few seconds. *Id*. Mr. Stocklin's girlfriend reported that he had been having outbursts recently, including outbursts where he threw items outside and kicked a tree. *Id*. Mr. Stocklin also reported that his girlfriend did the shopping because he struggled to be around many people. (Tr. 537). Mr. Stocklin reported symptoms of low energy and fatigue; low motivation and lack of interest in activities; isolative behaviors; increased irritability; occasional crying spells; and feelings of hopelessness. (Tr. 546). He denied suicidal ideations. *Id*.

Mr. Stocklin had a follow-up session on June 8, 2015. (Tr. 475). His mental status was

stable, and he was not on any medication at that time. (Tr. 476). He reported that he experienced racing thoughts and that he became stressed when things were not in the right place. *Id*. He also reported that his anger was present seven days per week and rated his anger an eight out of ten. (Tr. 477). He said he felt that he was easily angered and would lash out by yelling, screaming, swearing, or hitting something. *Id*. He further reported that he had a hard time letting go and trusting others. *Id*. Mr. Stocklin said that he coped with stress and anger by working, staying to himself, and spending time with his girlfriend and his daughters. (Tr. 476).

Mr. Stocklin had another follow-up session on June 20, 2015. (Tr. 478). He stated that he was paranoid of others and mistrustful. *Id*. He also reported that he did not like being touched and disliked loud noises and repetitive sounds. *Id*. His counselor, Kimberly Butler, LSW, reported that Mr. Stocklin demonstrated symptoms of obsessive-compulsive disorder and high anxiety. (Tr. 480).

Mr. Stocklin had another session on August 5, 2015. (Tr. 487). He reported that he continued to be overwhelmed by his girlfriend's "disrespectful" daughter. *Id*. Ms. Butler noted that Mr. Stocklin's mental status was stable and that he had begun taking medication four days previously. (Tr. 488).

On August 14, 2015, Mr. Stocklin reported that he had begun experiencing vivid, scary dreams since he began taking medication. (Tr. 491). He also reported that he had been having thoughts of leaving work throughout the day. (Tr. 494). On August 25, 2015, Mr. Stocklin reported that he had not been sleeping well and that he was under a great deal of stress in his family life. (Tr. 495).

On October 3, 2015, Mr. Stocklin had another session with Ms. Butler. (Tr. 503). Ms. Butler noted that Mr. Stocklin was much calmer at that visit. *Id*. Ms. Butler also noted that he was learning to express his feelings in therapy, was taking medication, and was not currently working.

(Tr. 504).

Mr. Stocklin had another follow-up visit with Mr. Butler on November 3, 2015. (Tr. 507). He reported that he had been through four jobs in the past few weeks and that he was struggling to maintain employment. *Id*. He also reported that he was having a hard time with "fight, flight, or freeze" recently. (Tr. 508). He stated that he had been highly anxious and rated his anxiety as a ten out of ten. (Tr. 507).

On July 21, 2016, Mr. Stocklin had another session with Ms. Butler. (Tr. 519). He reported that he was very upset and was having a hard time managing his anger. *Id*. He also reported that he and his girlfriend might need to end their three-year relationship as a result of his irritation with her teenage daughter. *Id*. He further reported that his emotions had been difficult for him to manage and that he had been acting inappropriately. (Tr. 522). He stated that he planned to restart his medication and to reengage with therapy to manage his moods. *Id*.

On August 10, 2016, Ms. Butler noted that Mr. Stocklin was pacing and talking in ways that demonstrated paranoid thinking patterns. (Tr. 523). Ms. Butler also noted that Mr. Stocklin was very impatient, angry, and irritated. *Id*. Ms. Butler also stated that she spoke to Mr. Stocklin about his paranoid thinking patterns but that he was resistant to the conversation. (Tr. 526). Ms. Butler further noted that Mr. Stocklin had a pattern of losing jobs because of his inability to get along with others, and that he felt like others were targeting him. *Id*.

On November 14, 2016, Mr. Stocklin visited Mercy Health, complaining of anxiety, chest and head congestion, generalized body aches, and depression. (Tr. 837). He reported anhedonia, depressed mood, difficulty concentrating, fatigue, feelings of worthlessness and guilt, hopelessness, impaired memory, insomnia, and weight loss. *Id*. He also reported that his symptoms had begun two months previously and had gradually worsened since that time. *Id*.

On November 27, 2017, Mr. Stocklin had another visit at Coleman Professional Services.

(Tr. 464). He was cooperative and well-groomed, with a euthymic mood, average eye contact, clear speech, and full affect. *Id*.

On January 18, 2018, Mr. Stocklin had another session at Coleman Professional Services. (Tr. 473). It was noted that Mr. Stocklin was anxious about having missed a court hearing and that his speech was rapid and tangential. *Id*. After discussing the issue with a counselor, Mr. Stocklin reported feeling less anxious. (Tr. 473-74).

Mr. Stocklin had another session on May 9, 2018. (Tr. 555). It was noted that Mr. Stocklin had not seen a provider in several years. *Id*. He reported that he had stopped going to therapy because he had been referred to a different counselor and had not connected with her as well had he connected with Ms. Butler. *Id*. Mr. Stocklin also reported that he struggled with sleep, anxiety, and depression. *Id*. He reported that he had days where he felt really lucky about life and other days where he felt very down. (Tr. 563). He reported that he had one good day per week and one very bad day, while the remaining days were mediocre. *Id*. He further stated that he had difficulty maintaining employment due to interpersonal issues and that he had left jobs if he felt someone was being disrespectful. (Tr. 557). Mr. Stocklin also reported that he had never had suicidal thoughts but that he did experience thoughts of death and feeling that he was a burden to his family. (Tr. 574).

On October 2, 2018, Mr. Stocklin had another counseling session at Coleman Professional Services. (Tr. 531). He was cooperative, preoccupied, and anxious. *Id*. He reported that he was very depressed. (Tr. 533).

On March 1, 2019, Mr. Stocklin had another follow-up session, during which he reported experiencing homicidal thoughts regarding his new girlfriend's estranged husband. (Tr. 765). Mr. Stocklin also reported that he and the estranged husband had ongoing conflicts, including multiple occasions where the police were involved. *Id*. Mr. Stocklin further stated that he had a very good

relationship with his new girlfriend and was excited about building a new life and family with her. *Id*.

Mr. Stocklin attended an outpatient neurology visit on March 5, 2020. (Tr. 2244). He was alert and appropriate, and his language expression and comprehension, fund of knowledge, and processing speed were intact. *Id*.

On March 25, 2021, Mr. Stocklin visited Mercy Health. (Tr. 1989). It was noted that Mr. Stocklin was taking medication for depression and that psychiatry may be necessary for his depression and generalized anxiety disorder if his symptoms did not improve. (Tr. 1990). He reported that medication had improved his depression but had not improved his anxiety. *Id*. It was also noted that Mr. Stocklin had been hospitalized two months previously for a suicide attempt. *Id*. He denied suicidal ideation. *Id*. Mr. Stocklin had follow-up visit at Mercy Health on April 19, 2021, during which he was diagnosed as experiencing a current, severe episode of major depressive disorder without psychotic features and without prior episodes. (Tr. 1957).

## IV.    THE ALJ'S DECISION

The ALJ first determined that Mr. Stocklin met the insured status requirements of the Social Security Act through March 31, 2018. (Tr. 1665). The ALJ further determined that Mr. Stocklin had not been engaged in any gainful activity since April 13, 2017, the alleged onset date of his disability. *Id*.

The ALJ next determined that Mr. Stocklin had the following severe impairments: depression; anxiety; mood disorder/post-traumatic stress disorder (PTSD); disorders of the spine; cervical (with radiculopathy) and lumbar; essential tremors; fibromyalgia; carpal tunnel syndrome, bilateral; and kidney stones, recurrent. *Id*. The ALJ found, however, that none of Mr. Stocklin's severe impairments, whether singly or in combination, met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 1666).

The ALJ next determined that Mr. Stocklin had the residual functional capacity ("RFC") to:

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; occasional balancing (as defined by the SCO); occasional stooping, kneeling, crouching and crawling; frequent handling/fingering bilaterally; occasional operation of foot controls bilaterally; no exposure to vibration/vibrating tools, unprotected heights or moving mechanical parts; no operation of a motor vehicle within the scope of employment. The individual would further be limited to "low stress" work, which is defined as: simple, routine and repetitive tasks in an environment free from fast-paced production work (such as an assembly line or conveyor belt) with only simple work-related decision-making and few, if any, workplace changes; occasional contact with supervisors and "incidental and superficial contact" coworkers and the general public. "Incidental" contact with coworkers is defined as: may encounter or pass in common areas, such as time clocks, breakrooms, restrooms, lunchrooms; may even work at the same table with other workers; no requirement of interaction with coworkers in order to successfully complete assigned tasks. "Incidental" contact with the general public is defined as: may pass or encounter in common areas, such as hallways, restrooms or lobbies, but there would be no requirement of interaction with the general public in order to successfully complete assigned tasks. "Superficial" is defined as: able to be in the proximity of others, able to exchange greetings, and able to engage in brief discussions that do not require persuasion or involve tandem tasks.

(Tr. 1668-69).

The ALJ next found that Mr. Stocklin was unable to perform any past relevant work. (Tr. 1680). However, the ALJ also found that Mr. Stocklin could perform jobs that exist in significant numbers in the national economy, including work as a document preparer, tube operator, or touch-up screener. (Tr. 1680-81). Accordingly, the ALJ determined that Mr. Stocklin was not disabled. (Tr. 1681).

## V.    LAW & ANALYSIS

### A.    **Standard of Review**

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r*

*of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quotation omitted). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation omitted).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996))

13

(alteration in original).

### B.    Standard for Disability

To establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a). A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.[2]

Consideration of disability claims follows a five-step review process. 20 C.F.R. §404.1520. First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d).

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in some instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq*. The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (*e.g.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 416.930(e). At the fourth step, if the claimant's impairment or combination of impairments does not prevent him from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g). *See Abbott*, 905 F.2d at 923.

**C.  Analysis**

Mr. Stocklin argues that this case should be remanded because the ALJ failed to build a logical bridge between the evidence and his RFC. In particular, Mr. Stocklin argues that the ALJ improperly replaced the state agency psychologists' specific limitations with her own limitation that Mr. Stocklin could only have "incidental and superficial" contact with coworkers and the public, terms the ALJ herself defined. Mr. Stocklin also argues that the ALJ excluded the state agency psychologists' opinion that any feedback from supervisors should be constructive. I conclude that Mr. Stocklin's arguments are not well-taken for two reasons.

As an initial manner, I agree with the Commissioner that Mr. Stocklin waived any challenge to the manner in which the ALJ defined "superficial" or "incidental" contact by failing to object to the ALJ's definitions when the ALJ presented them to the VE during the administrative hearing. "The Sixth Circuit, along with other courts across the country, have generally recognized that a claimant's failure to object to testimony offered by a vocational expert, at the time of the administrative proceeding, waives the claimant's right to raise such issues in the district court." *Dixon v. Comm'r of Soc. Sec.*, No. 5:22-CV-02105-CAB, 2023 WL 7092827, at *8 (N.D. Ohio

Sept. 20, 2023), *report and recommendation adopted*, 2023 WL 7048666 (quoting *Robinson v. Comm'r of Soc. Sec.*, No. 1:15-cv-509, 2016 WL 3085762, at *9 (W.D. Mich. June 2, 2016)) (citing cases).

Indeed, several courts have held that a claimant waives any challenge to an ALJ's definition of "superficial" contact where the claimant does not object or offer an alternative definition during the hearing. *See Dixon*, 2023 WL 7092827 at *8 ("The Commissioner also argues that because the ALJ defined 'superficial contact' the same way when questioning the vocational expert and Claimant's attorney failed to object, this argument is waived. The Court agrees with the Commissioner that Claimant has waived this argument.") (citation omitted); *Austin v. Comm'r of Soc. Sec.*, No. 1:22-CV-02003-BMB, 2023 WL 7017930, at *9 (N.D. Ohio Sept. 18, 2023) (report and recommendation) (holding that claimant waived challenge to ALJ's definition of "superficial interaction" by failing to object or offer a contrary definition at the hearing); *James v. Comm'r of Soc. Sec.*, No. 1:22-CV-1915, 2023 WL 4172932, at *20 (N.D. Ohio June 5, 2023) ("As a threshold matter, the Commissioner correctly argues that James waived any concern about the ALJ's definition of 'superficial interaction,' because she failed to raise any concerns about the definition during her ALJ hearing."). Notably, Mr. Stocklin does not respond to the Commissioner's waiver argument and does not cite any contrary authority. I therefore conclude that Mr. Stocklin has waived any challenge to the manner in which the ALJ defined "incidental and superficial" conduct in his RFC.

Even if Mr. Stocklin had not waived any challenge to the ALJ's definitions, however, I conclude that the ALJ's RFC is supported by substantial evidence. While Mr. Stocklin argues that the ALJ failed to properly account for the limitations identified by the state agency psychologists, "[a] claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio

Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250. The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013).

"In rendering [her] RFC decision, t]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Golden*, 2018 WL 7079506 at *17 (quoting *Fleischer*, 774 F. Supp. 2d at 880). However, "[i]t is plaintiff's burden to prove the severity of her impairments, and to provide evidence establishing her RFC." *Lumpkin v. Comm'r of Soc. Sec.*, No. 1:20-CV-1849, 2021 WL 4987607, at *3 (N.D. Ohio Oct. 27, 2021). "The Sixth Circuit has repeatedly upheld ALJ decisions where the ALJ rejected medical opinion testimony and determined RFC based on objective medical evidence and non-medical evidence." *Borawski v. Comm'r of Soc. Sec.*, No. 1:20-CV-01091-JDG, , 2021 WL 811717, at *18 (N.D. Ohio Mar. 3, 2021) (quoting *Hipp v. Comm'r of Soc. Sec.*, No. 1:17-CV-0846, 2018 WL 1954361, at *9 (N.D. Ohio Apr. 5, 2018), *report and recommendation adopted*, 2018 WL 1933393).

Mr. Stocklin acknowledges that it is the ALJ's job to determine an RFC, and states that he is not arguing that the ALJ was required to adopt verbatim all limitations that the state agency psychologists identified. Instead, he argues that it was error for the ALJ to replace the social interactions limitations the state agency psychologists identified with a limitation to "incidental and superficial" contact, contending that the phrase "incidental and superficial" is "vocationally irrelevant." (ECF No. 10, PageID # 2365).

Mr. Stocklin is correct that, "the term 'superficial interaction' does not have a specific defined meaning under the DOT or [the Selected Characteristics of Occupations]." *Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-cv-02370, 2022 WL 721455, at *17 (N.D. Ohio Jan. 13, 2022),

17

*report and recommendation adopted*, 2022 WL 716105. at *17. Because the term "superficial" does not have a clear vocational meaning, the ALJ's use of it, standing alone, could present a problem. Crucially, however, the ALJ did not simply insert the terms "incidental" and "superficial" into the RFC without explaining what she meant by those terms. Instead, the ALJ specifically defined "incidental" contact with coworkers as "may encounter or pass in common areas, such as time clocks, breakrooms, restrooms, lunchrooms; may even work at the same table with other workers; no requirement of interaction with coworkers in order to successfully complete assigned tasks." (Tr. 1669). The ALJ similarly defined "incidental" contact with the general public as "may pass or encounter in common areas, such as hallways, restrooms or lobbies, but there would be no requirement of interaction with the general public in order to successfully complete assigned tasks." *Id*. Finally, the ALJ defined "superficial" interactions as "able to be in the proximity of others, able to exchange greetings, and able to engage in brief discussions that do not require persuasion or involve tandem tasks." *Id*.

A number of courts have held that an ALJ may provide his or her own definition of the term "superficial" while formulating an RFC so long as the ALJ's definition is supported by substantial evidence. As the court held in *Betz v. Commissioner of Social Security*, No. 3:21-CV-2408, 2022 WL 17717496 (N.D. Ohio Nov. 8, 2022), *report and recommendation adopted*, 2022 WL 17985680, "[a]lthough the ALJ must connect the RFC limitations to the evidence and build a logical bridge between the two, this does not require that the ALJ provide explicit reasoning for why he defined superficial the way he did. Rather, the ALJ needed to explain why he determined that Betz was limited to superficial contact *as he defined it*, and it is sufficient that the record not be clearly contrary to that definition." *Id*. at *11 (emphasis in original); *see also Harcula v. Comm'r of Soc. Sec.*, No. 1:22-CV-01950-CEF, 2023 WL 6050291, at *15 (N.D. Ohio Aug. 31, 2023), *report and recommendation adopted*, 2023 WL 6049326 (N.D. Ohio Sept. 15, 2023)

(rejecting claimant's argument that the ALJ improperly expanded the definition of "superficial" interaction by including a limitation of no arbitration, negotiation, confrontation, or being responsible for the safety or supervision of others, in part, because claimant "d[id] not cite any other legal authority or present a persuasive argument to the contrary"); *Richard S. v. Comm'r of Soc. Sec.*, No. 2:22-cv-2176, 2023 WL 2805347, at *14 (S.D. Ohio Apr. 6, 2023), *report and recommendation adopted*, 2023 WL 6318135 ("Although the ALJ did not explain how he arrived at his definition of superficial, the definition he chose is supported by substantial evidence and is not contradicted by the other record evidence.").

Mr. Stocklin does not dispute this line of cases and does not cite to any contrary authority with respect to the term "incidental." Instead, he argues that the ALJ's definition of "superficial" is erroneous because it conflicts with a definition that the Appeals Council provided in another case, in which it stated that the term superficial is "understood and applicable to a work setting, as it speaks to the depth, kind and quality of social interactions, and indicates that the claimant could not have sustained more than shallow or cursory interactions with others, i.e., coworkers, the general public, and/or supervisors." (ECF No. 6, PageID # 2343) (citing ECF No. 6-1). Mr. Stocklin's argument is without merit. As a court in the Southern District of Ohio recently held in rejecting an identical argument, Mr. Stocklin "fails to explain how the Appeals Council's definition of the term 'superficial,' which occurred in a separate social security case . . . would have any consequence in this action currently before the Court." *Paul S. v. Comm'r of Soc. Sec.*, No. 2:22-cv-4090, 2023 WL 6389428, at *4 n.5 (S.D. Ohio Sept. 30, 2023), *report and recommendation adopted*, 2023 WL 7002734. In addition, Mr. Stocklin "fails to put forth any analysis or argument as to why the ALJ's definition of 'superficial' in this matter does not comport with the Appeals Council's definition of the term 'superficial.'" *Id.*

Thus, the ALJ was permitted to use and define the terms "superficial" and "incidental" so

long as the limitations encompassed by those terms, as the ALJ defined them, were supported by substantial evidence. I conclude that the ALJ met that burden here. As the ALJ noted elsewhere in the decision, evidence in the record shows that Mr. Stocklin is able to live with others, spend time with family and his girlfriend, shop in stores, and attend appointments. (Tr. 1667). The ALJ also noted that Mr. Stocklin denied any problems getting along with friends, family, neighbors, or others, and was noted to be pleasant or cooperative at examinations. *Id*. The ALJ further noted that Mr. Stocklin reported feeling relief relating to aggression and outbursts when he was in counseling. (Tr. 1675). Finally, the ALJ noted that Mr. Stocklin's mental health treatment history was "limited and sporadic." (Tr. 1677). That evidence, taken as a whole, supports the ALJ's decision to define "incidental and superficial" interactions the way she did in Mr. Stocklin's RFC. The ALJ's definition was also consistent with case law, as "courts have found that an RFC which limits a claimant's interaction to 'no team or tandem tasks' properly accounts for a limitation of a claimant to superficial interaction with others." *Stoodt*, 2022 WL 721455 at *11 (citing cases).

Notably, while Mr. Stocklin argues that the ALJ's definitions of "superficial" and "incidental" were improper, he only identifies one particular aspect of the RFC that he believes is inconsistent with the opinions of the state agency psychologists. Specifically, Mr. Stocklin argues that the ALJ erred in omitting the state agency psychologists' opinion that any feedback from supervisors should be constructive. Mr. Stocklin also argues that, while the ALJ limited Mr. Stocklin to "occasional" contact with supervisors, that limitation does not properly account for the state agency psychologists' opinions because the state agency psychologists' opinions went to the nature of Mr. Stocklin's contact with supervisors while the ALJ's RFC went only to the frequency of that contact.

This question presents a closer call than the ALJ's decision to use and define the terms "superficial" and "incidental," and it would have been preferrable for the ALJ to specifically

explain why she limited Mr. Stocklin to occasional contact with supervisors without requiring that any feedback be constructive. It is also true, as Mr. Stocklin argues, that courts have held the term "occasional" addresses the frequency of the interaction rather than the quality. *See Stoodt*, 2022 WL 721455 at *13 ("the DOT and SCO do have specific defined terms for the frequency of activities or conditions, defining 'occasional' activities and conditions as those existing up to one-third of the time."). Accordingly, the ALJ's RFC arguably does not fully incorporate the state agency psychologists' opinions, even though the ALJ found those opinions "somewhat persuasive."

However, even where an ALJ provides "great weight" to a medical opinion—more weight than the ALJ gave the state agency psychologists' opinions here—there is no requirement that an ALJ adopt the verbatim language of that opinion. *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) (noting that an ALJ is not required to adopt each restriction of an expert to which he gave great weight). Indeed, there is authority for the proposition that an ALJ does not err in failing to include a limitation to constructive feedback even where the ALJ otherwise finds a medical opinion persuasive. *See Jackson v. Comm'r of Soc. Sec. Admin.*, No. 1:18CV2362, 2019 WL 5802497, at *11-12 (N.D. Ohio Sept. 3, 2019), *report and recommendation adopted sub nom.*, 2020 WL 858061 (holding that ALJ did not err in failing to include requirement in RFC that supervisors should offer positive feedback and constructive criticism despite giving great weight to opinions of state agency psychologists because ALJ is "not required to adopt the opinions verbatim or wholesale"); *cf. Calzo v. Saul*, No. 4:19CV00598, 2020 WL 2362057, at *6 (N.D. Ohio Feb. 4, 2020), *report and recommendation adopted*, 2020 WL 1041213 (holding that ALJ did not err in failing to include limitations identified by state agency psychologists because "[t]he ALJ's RFC finding does not outright *contradict* the State agency opinions, but rather, it simply *omits* the specific limitation about which they opined"); *Jordan v. Comm'r of Soc. Sec.*, No. 5:17-

cv-02466, 2018 WL 5884830, at *10 (N.D. Ohio Nov. 9, 2018) ("Jordan's contention that the ALJ's RFC is not supported by substantial evidence because it does not include each and every limitation contained in the medical opinions that were assigned 'weight' is unavailing").

Here, the ALJ incorporated social interaction limitations in Mr. Stocklin's RFC after finding the state agency psychologists' opinions "somewhat persuasive." As part of those limitations, the ALJ also limited Mr. Stocklin to occasional interactions with supervisors. The ALJ also limited Mr. Stocklin to "simple, routine and repetitive tasks in an environment free from fast-paced production work (such as an assembly line or conveyor belt) with only simple work-related decision-making and few, if any, workplace changes." (Tr. 1668-69). At least one court in this district has held that such a limitation also implicitly addresses a constructive feedback limitation. *See Winner v. Comm'r of Soc. Sec.*, No. 1:19-cv-2348, 2020 WL 4734756, at *13 (N.D. Ohio Aug. 13, 2020) (holding that ALJ "appears to have formulated the RFC to avoid the need for constructive criticism and avoid any greater than superficial interaction with supervisors by limiting [claimant] to simple tasks in a static environment with infrequent and gradually implemented changes"). While it would have been preferable for the ALJ to directly address why she did not include a constructive feedback limitation in the RFC, I conclude that the ALJ's RFC was nonetheless supported by substantial evidence and properly accounted for the opinions of the state agency psychologists. I therefore recommend that the Court affirm the Commissioner's decision.

## VI.     RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

Dated: <u>December 13, 2023</u>                    <u>s/ Jennifer Dowdell Armstrong</u>
                                                   Jennifer Dowdell Armstrong
                                                   U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v.*

*Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).